3-190358, the Petition of Realtax Developers, Appley versus Stephen Vigen, Appellant. Thank you. Good afternoon. Mr. Whitcomb, would you like to start? Yes, thank you, Your Honor. May it please the court. I do understand the court has the briefs in this matter, so I won't spend too much time on the facts, but I do think it's important to at least summarize a few key issues here. Back in 2017, there was a take notice that was sent to Mr. Vigen and his father at his childhood home. And the lower court did find that that take notice was actually served upon Mr. Vigen. Pursuant to the information provided in that take notice, Mr. Vigen contacted the county clerk's office. When he contacted the county clerk's office, he was told the amount of taxes to pay and how to pay them. He was told that he needed to pay them by wiring the money to the county's bank account. Now, at the trial, the clerks that all testified, all the ones that were there, all said that they would never give out that information, but the lower court did find that Mr. Vigen did receive that information from the clerk's office because there was no other way that he could have known the correct amount of money and the county's bank account information. The amount was sent in three chunks, 5,000 one day, 5,000 the next, and then at the end of the second day, the date the redemption period expired,  which was the correct amount required for redemption. Unbeknownst to Mr. Vigen, a $10 fee was taken off every fee. Had the county told him that he needed to bring a certified check, he could have done that. He clearly had the money, but they told him to pay through a wire transfer, so he did. It took two months before anyone had any idea what happened to the money when the county found the extra $10,000 in change sitting in the treasurer's account. Once they found the money, they issued a check for the full amount that was sent minus the $30 transaction fees that were charged by the bank. And they sent that check to Robert Vigen, which is Steven Vigen's, the appellate's father, who is now deceased. Robert Vigen at that time was suffering from late stage dementia and passed away less than a month after the check was mailed out. To this day, as far as I'm aware, the check has never been cashed. It certainly wasn't at the time of trial. And there was no other attempt made to contact either of the Mr. Vigen's. Mr. Robert Vigen, the appellate's father, passed away in November. And then in December, on December 1st, the court ordered a tax deed to issue. Mr. Vigen could have appeared at that court date. And had he known that the payment he made on August 16th, 15th, 16th, and then the one that processed on the 17th, had he known that that payment had not been accepted, he could have shown up on that day and the lower court said that they would have exercised their equitable powers and extended the relief or the period to redeem. And the trial court said they would have, it would have told Mr. Vigen to go and pay the extra $30 and get his house back. And some more time passed and June of 2018 rolls around when the sheriff shows up and evicts Mr. Vigen from his home. Between August 16th, when he sent the last part of the transaction and the June 22nd, I believe, he had no idea that his payment was not accepted. That includes the actual order that was issued by the court and no point did he ever receive notice of that order. And then once he was aware that the order had been issued and a tax deed had been granted when he was evicted, he had the motion that we're here upon today filed within 26 days. Some background for Illinois' property tax scheme. The purpose of it is quite simple. The state needs revenue, counties need revenue. And one of the ways they get that is by taxing properties. And when individuals don't pay their property taxes, others can come in and purchase the right to the taxes. And then at that point, there's a redemption period where an individual can redeem the property. Under Illinois law, redemption is considered a right. It's recognized as that in the statute. And there is a slew of case law, much of which is cited in the briefs that references redemption as a right. And not only a right, but a substantial right. Illinois law has traditionally favored redemption because they don't wanna kick people out of their homes. And because Illinois law favors redemption, courts have generally given liberal construction to redemption laws, as long as the purchaser is not injured or especially when the purchaser is not injured. And this favorable view of redemption is especially true when a home is potentially lost or potentially going to be lost because of mistake or misinterpretation. Another thing that courts have recognized with these property redemption cases is that each one is unique and must be addressed on its own facts and equities. Now, in this case, it wasn't just any mistake or misrepresentation. It was a mistake or misrepresentation made by the county clerk's office. And in situations where that is the case, where it was a government official who made the mistake or misrepresentation, courts have held that court intervention based on equity is especially appropriate. And on top of that, just in general, equity of course- I've got a couple of questions, sir, if you don't mind. Just on the facts, so I'm clear on the facts. You stated that it was the county clerk's office who told that the judge found told him to wire the money. Is that what the judge found or did you just find that it was a county official who told him to wire the money? The judge found that he made the call to the county clerk's office and that the circumstantial evidence did show that he got that information from the county clerk's office. From the county official. From the county official.  that was served informed the taxpayer how to redeem and in what way, certified check cash and where at, right? I believe the take notices that were issued told Mr. Vigan to contact the county clerk. There was one that was before the final take notice that said listed ways of payment, but that was referencing payments to real tax. The final take notice that was at E17 and the exhibits instructed Mr. Vigan to contact the clerk to pay that the petition was for a tax deed if redemption was not made on or before August 16th and that Mr. Vigan could be present at the hearing, but his right to redeem will have expired by that time. And had he shown up at the December hearing, he would have known of course that they were there seeking the tax deed, correct? Correct. Okay. All right, thank you. That clarifies it. Are there any other questions at this point? All right. Apparently not. All right, thank you. Then moving on, in general, whenever interpreting a law, it is important to go by the text of the law, but in situations dealing with the property tax statute, there are examples of courts going beyond the plain language of the law. One case came out subsequent to the briefs that were submitted in this case, so I'll just mention it. It was Fayette County Treasurer V. Dohm Tax Service Co, 2020, Illinois Appellate, 5th 190170. And it was handed down in February, 2020. And it was dealing with an administrative sale that was an error. And the court essentially said that they could go outside of the strict language of the statute to serve equity. Mr. Whitcomb, did you add authority on that? Is that in the record? It was, I'm sorry, Your Honor, it was not one that was in the record. It was handed down subsequent to the briefs. And you didn't file a motion to add authority. Mr. Barr. I did not, Your Honor. My apologies. Mr. Barr, are you familiar with that case? I am not, Your Honor. In that case, if it's all right with the court, I'll just move on and leave that case aside. Now with the legislation that is at issue here, 22-45, it limits the relief that can be sought under section 1401. While it certainly makes sense to limit it, the legislative intent is important when ascertaining the limits that were put into place. The legislative intent, as courts have expressed, was to further the marketability of tax deeds. And the purpose of tax deeds is to incentivize individuals to pay their property taxes. Allowing situations where there is an egregious forfeiture in violation of equity is not something that would discourage tax purchasers from purchasing tax deeds, or something that would really limit their marketability, especially one where the situation is so unusual as relying on a government official and getting incorrect information, proceeding to follow through and fulfilling the duty as you understand it, based on the county officials' instructions. If a strict reading of the statute is adopted, there will be certain situations where the tax deeds would be incontestable under 1401, when it would seem that there certainly should be some sort of equitable power of a courts to deal with them. One example is if the taxes are fully redeemed and a certificate of redemption is issued, but the tax deed is still ordered in error. On a strict reading of the statute, a 1401 motion could not be brought to have that deed voided. Another situation would be if the taxes were not redeemed due to an error or intentional misrepresentation of a government official, or if the tax deed was filed after the one-year period. Based on situations like that, falling outside of the section 2245 and the legislature's intent, it makes perfect sense to allow courts to have equitable powers when the forfeiture would be so egregious. And the reason that the taxes were not redeemed was based on an error by a county official. And that's exactly what we have here. The lower court held that, or explicitly made a finding that if Mr. Vegan had been there on the December 1st date, the lower court would have granted an equitable extension of the redemption period. And had Mr. Vegan known that his taxes had not been accepted, that his payment had not been accepted, he could have been there, he could have paid it. At that point, the money was still in the treasurer's account. The judge said he would have had Mr. Vegan pay an extra $30 and his house would have been redeemed. Let me interrupt you and just ask one question. That is, what's our standard of review here? This is a case of statutory interpretation, so it is de novo review. So with equity, as I touched on earlier, there's a balance of the harm that would be, that would happen to either party that is involved in the case. And here, the harm to Mr. Vegan is great. This was his family home that was mentioned in the record. He grew up there, he had his workshop there. And while there are ways where he could potentially recoup some of the value, the value of a home is not purely monetary. Now, there has, at this point, been no harm that would come to the appellees here. No harm there has been shown, or no injury has been shown would occur if redemption here was allowed. Now, we spoke a little bit earlier about the take notice. Mr. Vegan, the trial court held, did receive the take notice. But what the take notice told him was three things. One, to contact the clerk to pay, which he did before the redemption period expired. Two, was that the petition was for a tax deed if redemption was not made on or before August 16th of 2017, which, as far as he was concerned, it was. And three, that he may be present at the December 1st hearing, but his right to redeem will already have expired. As far as he was concerned, he had already redeemed his property. Lastly, I would just like to say that Mr. Vegan asked this court reverse the trial court's finding that the tax deed cannot be vacated after 30 days in any situation, no matter how egregious, unless that situation is listed under section 45. There are no further questions. Thank you. Are there any other questions? Mr. Barr. Thank you. May it please the court. I'm John Barr, I represent the Appley Real Tax Developers. For 70 years, the General Assembly has attempted to reach a balance between two public policies. The Supreme Court has repeatedly stated that a forced sale of a home is a grave and melancholy event. However, allowing a collateral attack of a tax, of a tax deed or it tends to undermine the finality and hence the marketability of the tax deed. This is significant because tax purchasers participate in the tax system in order to obtain merchantable titles. Our whole system of judicial sales is based upon the public's willingness to accept those tax deed titles. If purchasers do not participate in tax sales, delinquent tax buyers or taxpayers will lose the incentive to pay their taxes and revenues will fall. Tax purchasers represent a threat to property owners who will induce them to make timely payments. The case of Apex, also referred to as low number one, determined by the rule by the Supreme Court in 2005 and the Hawkeye v. Lenz and the Aziz v. Street cases, all of which have been cited in the briefs, provide a good review of the development of law since 1951, in which the General Assembly has attempted to reach a balance between these two public policies. It is clear that the General Assembly has reached this balance and the courts have followed it by requiring strict compliance in order to obtain an order for tax deed. Equitable principles do allow an equitable redemption prior to the issuance of a tax deed, even though the redemption date is passed. But after the order for tax deed has been entered, the General Assembly mandates that the deed be challenged only on those limited grounds under section 2245. Therefore, a tax deed property can be sold knowing that there is good title and it will not be overturned. In the 1980s, there were two cases which overturned an order for tax deed due to county air. There was the Sedaca case in 1988 and the Fredericks case in 1989, both of which were cited. In 1990, the General Assembly enacted amendments creating a new statutory ground for collateral relief that's available in circumstances where there's an error by a county official. The fifth paragraph in section 2245 was added in 1990 that allows a tax deed to be overturned in equity if there's been an error by a county official. However, there are five requirements, including that the objection, the petition to overturn the order must be filed within three months after the order was entered. And this only applies to counties of 3 million or more. Viggen did not qualify because he waited almost eight months after the order was entered to file his motion. And of course, Whiteside County has less than 3 million inhabitants. The 1990 amendments also added language that states that the grounds for relief of a collateral tax shall be limited to those set forth in the statute. Therefore, Viggen could not meet the requirements for relief under section 2245, and therefore is now arguing for relief under general equity principles. This is basically the same argument that was made by Mary Lowe in the Apex case. There, the Supreme Court would not consider a collateral attack in Apex based upon equity principles since relief by general equity principles is not one of those grounds listed in section 2245. And the court said clearly, section 2245 says that the grounds are limited to these set forth in this section. In Mary Lowe, in the Apex case, cited both Siddeck and Fredericks, as I said, allowed an order to be vacated, but the Supreme Court said those cases were decided before the 1990 amendments and therefore do not apply. Even if we do consider equity grounds, the facts in Apex are much more egregious than we have in our case. Mary Lowe was in a mental institution. She received no notice whatsoever of the tax petition. She had no ability to take any action to redeem or to challenge the entry of the order. Here, Viggen did not pay his taxes for four years. Prior to the petition, Viggen was sent three letters from Real Tax advising him that the taxes had been sold, and this included a warning letter that a petition was about to be filed. In addition, a representative from Real Tax visited the property. No one was at home, but he left his business card in the door. After the petition was filed, Viggen was served twice by the Whiteside County Sheriff. The deputy testified, he told Viggen the date and the time of the hearing. In addition, Stephen Viggen's father, Robert, was served as well. Although Viggen claims he didn't receive any of these letters, he didn't receive the sheriff's service, he still miraculously called the county clerk on August 15th, 2017, the day before the redemption. He claims the clerk told him the amount of the redemption, the redemption could be made in two payments, it had to be paid by August 16th, and it could be paid by wire transfer. This was disputed by the county clerk and his employees. And to address the question the judge asked, the trial court did not find that someone from the county clerk had provided this information to Viggen. At page 197, the court said it could have come from real tax, it could have come from the bank, it could have come from someone at the county, but there was no finding that it came from the county clerk. And in addition, the court said it was speculative as to how Viggen actually obtained the wire transfer information. Now, in spite of what Viggen claims he was told, he made three payments over three days, the last one being August 17th, the day after the redemption period. Although Viggen knew he could lose his house and that one payment would be late, clearly showed on his exhibit, it was being set the 17th. He did absolutely nothing to determine whether if his redemption had been accepted. In his 2-14-01, both 2-14-01 motions he filed, the original and the amended, he claimed that he had been informed that redemption had in fact occurred. But in the trial, he admitted that that was not true and that no one from Whiteside County ever told him that his attempted redemption was accepted. He did not call the county clerk after August 17th. Even though he called him on the 15th, he knew how to call them, but he didn't make the effort to even call to see if his redemption had been accepted. Neither the county clerk or the treasurer had any idea that Viggen had made these payments. It was not until October that she discovered that the three deposits had been made into the treasurer's account. Keep in mind, the county clerk didn't even have a bank account, that those deposits were made in an attempt to redeem the taxes. Once the treasurer found out, she sent a letter with a refund check to Viggen on October 6th, 2017. Although it was addressed to Robert Viggen, it was at the property address where Stephen Viggen said that he was living and received his mail, commonly received his father's mail. No mail had been stolen, had not had problems with mail, et cetera. This would be the fourth letter that Viggen claims he did not receive. None of these letters were ever returned to the sender. Viggen knew that there was a hearing on December the 1st. He did not appear or make any inquiry to determine what happened at that hearing. Viggen also denied receiving letters on April 18th and April 27th, 2018 from real taxes agents. That would be six letters that Viggen claimed he did not receive. Again, they were all sent to the correct address and never returned to sender. This is in addition to the sheriff's services he claimed never happened. As the trial court said on record page 188 or 189, 190, Mr. Viggen, you have no one to blame but yourself, the circumstances you find yourself today. The trial court as a matter of law found that the redemption was not proper. It was the wrong amount paid to the wrong official. It was paid late. It was paid in installments and it was not by certified mail or by certified check, et cetera, under the statute. Viggen also argues that he was denied due process in this matter. He did not, as I stated in my brief, he did not raise the issue at the trial court and should not be allowed to raise it on appeal. But if he does argue it, he must fail. Due process and the tax deeds have been addressed and upheld numerous times. An elementary requirement of due process is that notice must be reasonably calculated to apprise the parties of the action before they have an opportunity to present objections. Viggen was served twice with the take notice. It is hard to understand how he can be claiming that his due process rights were violated. In his brief, Viggen also argued that it was only $30 that he was short. In my brief, I cited several cases in which the tax deeds were upheld for very small amounts. In the Ware case, $41.57. And the Supreme Court said in Stanley versus Bank of Marietta, it is unfortunate the apparently suffered the loss of their property because of one year's taxes. It is clear, however, they were fully informed of the sale or afforded every opportunity to redeem or defend. Having failed to do so, they are in no position to collaterally attack the original tax deed proceedings. In mid first, the tax deed was upheld over a $2 deficiency. The trial court said the legislature should consider additional amendments to section 2245 to prevent unjust results. But it held, it was the court's obligation to uphold the laws as written until the legislature sees fit to change them. Viggen does have an alternative remedy, however. There is an indemnity fund. Every county has an indemnity fund as the tax buyer pays an additional fee for every tax certificate sold. The Supreme Court in both Apex and Cornelius recommended that the former property owner seek relief under the indemnity fund. This would achieve, the indemnity fund was created under equity where a property loses, where a property owner loses their property in order to receive a reimbursement. There must be finality. Oh, I'm sorry. I would also address that the standard of review for a interpretation of a statute is de novo. But it is an abuse of discretion standard on a factual issue as to, or on an issue on appeal. So if the issue on appeal is whether or not Viggen would actually redeem the property, redeem the taxes properly, in my opinion, that would be an abuse of discretion standard. Are there any questions I can address at this point? I have a question, sir. Yes, ma'am. It's not clear to me that 214.01 is actually available as a remedy just because I don't understand one part of the procedure. It appears that the property was actually sold to RealTax. in October of 2014. And the 2245 refers to payment before the sale. So I guess my question is, is 214.01 even available as a remedy if payment is made in the redemption period? When does the sale actually take place? Well, the tax sale did occur in October, as you've said, in 2014. There's some confusion, perhaps. The first ground under section 2245 for vacating an order for tax deed is proof that the taxes were paid prior to the sale. That would have been prior to October of 2014. That, of course, did not happen here. If the taxes are paid during the redemption period and a tax deed should not have been issued, then the order is, because at the time the taxes are paid, the taxes are no longer outstanding, the money is paid to the tax purchaser, and the tax person surrenders their certificate. There's no longer any certificate in which to file a tax. And of course, it's very, very common for that to occur. Now, let's say that the taxes weren't paid during the redemption, then 214.01 is the proper remedy to attempt to overturn the tax deed. In conclusion, there must, did that answer your question, Your Honor? Yes, it does. Thank you. There must be finality in the tax deed process so the delinquent property can reenter the stream of commerce. The General Assembly did add an equity provision under Section 2245, but Viggen does not qualify. There is no case that Viggen can cite that occurred after 1990, the 1990 amendments that allows equity to vacate an order for tax deed. The allowing Viggen to overturn this deed would be contrary to the holdings of Apex and contrary to the provisions of Section 2245. The message should be that the failure to pay your taxes can have great consequences, such as the loss of your home. The message should not be that you can ignore the entire proceedings. You can ignore the notices. You can ignore the sheriff's service. You can then throw yourself to the mercy of the court in equity. Allowing Viggen to overturn the deed after eight months after the order was entered would mean that orders for tax deed are not final. It would upset the balance the General Assembly has created between two conflicting public policy would undermine the merchantability of tax titles. As the court said, Mr. Viggen brought this on himself. He did not pay attention to the tax deed process. He waited to the last minute to make any inquiries. He did more importantly, he didn't follow up at all to see what happened. Was my attempted redemption successful? Was it accepted? What happened at the hearing on December the 1st? If he had taken any action during that time and even appeared as the judge said, he would have allowed equity, but Mr. Viggen didn't, we need to continue the process and uphold the law. Thank you. Thank you, Mr. Wood. Mr. Wood, any rebuttal? Briefly, Your Honor, and thank you. Mr. Barr did mention, as I had also touched on, the importance of the marketability of tax deeds. We're not at all disputing that the marketability of tax deeds is vital for the system to work, but an individual's ability to rely on a government official and how to pay his taxes is equally as important. Another point that Mr. Barr brought up that I would like to address is, yes, the motion was filed eight months after the order itself, but only 26 days after Mr. Viggen had actual knowledge of the order and all of the notices and service, at least all that the trial court found that Mr. Viggen actually received were sent before he actually paid. And then as Mr. Barr did mention, the lower court did find that, had Mr. Viggen shown up at the hearing, he would have granted an equitable extension and told him to go pay that extra $30. Lastly, I would like to address the indemnity fund that Attorney Barr brought up. While that certainly is an alternative solution, it is not by any means a reason to not allow equity in this case. And one of the main reasons for that is property is unique. And as I touched on in the primary argument, the value of the house is by no means purely voluntary. In this court, I would like, or at this point, I would like to thank the court and unless there are any other questions, just reiterate the earlier prayer for me. Are there any questions? No questions. We thank both of you for your arguments this afternoon. We'll take the matter under advisement and we'll issue a written decision as quickly as possible. The court will now stand in recess until nine o'clock tomorrow morning.